AN
USDC- BALTIMORE
'24 JAN 11 A 10:45

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND
# NORTHERN DIVISION

JOSHUA HARRELL
(they/them/their/theirs)
101 W FAYETTE ST #435
BALTIMORE, MD 21201
joshuaj1729@gmail.com
650-334-9427,

      Plaintiff,

      vs.

UNIVERSITY OF MARYLAND
SCHOOL OF PHARMACY
20 N PINE ST
BALTIMORE, MD 21201,

      Defendant.

Case No.: **GLR 24 CV 0104**

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

## INTRODUCTION

1. Defendant The University of Maryland School of Pharmacy brought student disciplinary charges ("Grievance") against Plaintiff Joshua Harrell, alleging that Plaintiff had violated Defendant's Student Honor Code and Technical Standards.

2. However, out of the ten allegations of Plaintiff's conduct listed in the Grievance, nine of the allegations described petition and other expressive conduct protected under the First Amendment. The only remaining allegation was brought in retaliation against Plaintiff's alleged exercise of First Amendment rights.

1 – COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

3. Ignoring Plaintiff's First Amendment objections, Defendant intends to hold a hearing on January 24, 2024 to address the Grievance, at which time the Discipline and Grievance Committee ("Committee") will decide whether Plaintiff should be dismissed from the University of Maryland School of Pharmacy based on the Grievance. Furthermore, Defendant has indicated that sometime late in the week of January 15, Defendant will send to the Committee a series of documents alleging that Plaintiff engaged in activity protected by the First Amendment.

4. Accordingly, Plaintiff requests preliminary and permanent injunctive and declaratory relief to enforce the First Amendment and protect Plaintiff's First Amendment rights.

## TABLE OF CONTENTS

**JURISDICTION AND VENUE**                                          3

**PARTIES**                                                         4

**RELATED CASE**                                                    4

**FACTS**                                                           4

**Question to Guest Pharmacist at Forum**                           7

**Incorrect Signs at Forum**                                        8

**Email to PHAR 505 Course Managers**                               9

**Meeting with PHAR 505 Course Managers**                           9

**Class participation**                                            12

**Pharmacy Professor Q&A**                                         14

**Blowing Nose**                                                   14

**Preliminary Evaluation Panel**                                   15

**Grievance notification**                                         16

**Plaintiff's administrative request for dismissal denied**         16

**UMSOP Technical Standards**                                      17

**COUNTS**

**FIRST COUNT: QUESTION TO GUEST PHARMACIST AT FORUM**

SECOND COUNT: INCORRECT SIGNS AT FORUM

THIRD COUNT: EMAIL TO PHAR505 COURSE MANAGERS

FOURTH COUNT: MEETING WITH PHAR505 COURSE MANAGERS

FIFTH COUNT: ASKING QUESTIONS ABOUT CONFORMATIONS AND
STEREOCHEMISTRY IN CLASS

SIXTH COUNT: DISCUSSING GENERAL PATIENT MANAGEMENT
INFORMATION IN PROFESSIONAL FOUNDATIONS OF PHARMACY CLASS

SEVENTH COUNT: USING CHATGPT AND WIKIPEDIA IN CLASS

NINTH COUNT: PHARMACY PROFESSOR Q&A

TENTH COUNT: BLOWING NOSE

**PRAYER FOR RELIEF**

**CONCLUSION**

**VERIFICATION UNDER PENALTY OF PERJURY**

## JURISDICTION AND VENUE

5. This Court has jurisdiction under Article III, Section 2 of the Constitution over the cases and controversies of this Complaint, which arise under the First Amendment. This Court has jurisdiction under 42 U.S.C § 1983 over this Complaint of deprivation of First Amendment rights under the color of state authority.

6. The District Court has original jurisdiction under 28 U.S. Code § 1331 and § 1343.

7. The Court has jurisdiction over declaratory relief under 28 U.S. Code § 2201 and § 2202.

8. Venue is proper in the District Court for the District of Maryland under 28 U.S. Code § 1391, because Defendant is a resident of Maryland and because all relevant acts and omissions occurred in Maryland.

9. Venue is proper in the Northern Division under Local Rule 501(4)(a)(ii) because Defendant is an agency of the State of Maryland and Plaintiff is a resident of Baltimore City, Maryland.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**PARTIES**

10. Plaintiff Joshua Harrell is a resident of Baltimore City, Maryland. During the Fall 2023 semester, Plaintiff was a student at Defendant, the University of Maryland School of Pharmacy.

11. Defendant The University of Maryland School of Pharmacy is an entity and agency of the State of Maryland. Defendant is part of the University of Maryland Baltimore, the University of Maryland, and the University System of Maryland. The University System of Maryland was commissioned by the General Assembly through Maryland Education Code § 12-101. The Maryland State Archives, through the Maryland Manual On-Line, lists the School of Pharmacy within the organizational structure of the University of Maryland, Baltimore.

**RELATED CASE**

12. Plaintiff previously filed a Petition for Administrative Mandamus against Defendant seeking the same relief, in the Baltimore City Circuit Court, with Case No. 24-C-23-004658. The case is pending in that court, and Plaintiff has filed a Notice of Appeal to the Appellate Court of Maryland in response to the Circuit Court's denial of injunctive relief. The state case raises causes of action under Articles 40 and 43 of the Maryland Declaration of Rights, which cannot be brought to the original jurisdiction of this Court. This Court considers civil rights actions under 42 U.S.C § 1983, which is a separate legal standard from that employed by the state court, which rejected injunctive relief on state law grounds, entirely bypassing the federal civil rights questions. However, both cases turn on the same questions of fact. Both cases can be brought to issue simply by Defendant's admission of the authenticity of the attached Exhibits. However, if any factual disputes come into play, both this Court and the state court will likely need to resolve the same factual disputes.

**FACTS**

13. For the purposes of this case, Plaintiff asks that this Court treat all facts alleged by

4 – COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Defendant in the Grievance and attachments as true. This is necessary in order to evaluate whether the Grievance and attachments, as they appear on their faces, are preempted by the First Amendment. For all other purposes, Plaintiff reserves the right to admit, deny, challenge, discredit, or seek clarification on any of Defendant's alleged facts, whenever these actions would be truthful and appropriate.

14. Plaintiff Joshua Harrell was a first year Doctor of Pharmacy (PharmD) student at Defendant UMSOP during the Fall 2023 semester. Plaintiff was accepted to the program in January 2023 and formally began studies at UMSOP in August 2023.

15. Plaintiff is informed and believes that Andrew Coop, PhD (Dr. Coop) is and was at all relevant times the Associate Dean for Academic Affairs at Defendant UMSOP. By the nature of this office, Dr. Coop is empowered by Defendant's Student Honor Code with a variety of responsibilities related to student discipline. Plaintiff is informed and believes that Dr. Coop sits on the Preliminary Evaluation Panel.

16. Plaintiff is informed and believes that Sandeep Devabhakthuni, PharmD, BCCP (Dr. Dev) is and was at all relevant times the Associate Dean of Student Affairs at Defendant UMSOP. Plaintiff is informed and believes that Dr. Dev is the author of the operative Grievance.

17. Plaintiff is informed and believes that Steven Fletcher, PhD (Dr. Fletcher), is and was at all relevant times a professor at Defendant UMSOP. Plaintiff is informed and believes that Dr. Fletcher sits on the Preliminary Evaluation Panel.

18. Plaintiff is informed and believes that Patricia A. Ross, Pharm.D, MEdHP, BCACP (Dr. Ross), is and was at all relevant times a professor at Defendant UMSOP and a Course Manager in the PHAR 505 Abilities Lab 1 course, in which Plaintiff was enrolled as a student during Fall 2023. Plaintiff is informed and believes that the title of Course Manager indicates that Dr. Ross is the highest ranking faculty member directly responsible for PHAR 505, at equal rank with Dr. Trovato.

19. Plaintiff is informed and believes that James A. Trovato, Pharm.D, MBA, FASHP (Dr.

Trovato), is and was at all relevant times a professor at Defendant UMSOP and a Course Manager in the PHAR 505 Abilities Lab 1 course, in which Plaintiff was enrolled as a student during Fall 2023. Plaintiff is informed and believes that the title of Course Manager indicates that Dr. Trovato is the highest ranking faculty member directly responsible for PHAR 505, at equal rank with Dr. Ross.

20. Plaintiff is informed and believes that Cherokee Layson-Wolf, PharmD (Dr. Layson-Wolf) is and was at all relevant times a professor at Defendant UMSOP.

21. Plaintiff is informed and believes that Jill A. Morgan, PharmD, BCPS, BCPPS, FNAP (Dr. Morgan) is and was at all relevant times a Professor and Chair Department of Practice, Sciences, and Health Outcomes Research at Defendant UMSOP, and is responsible for the Department in which the PHAR 505 course sits. Furthermore, Dr. Morgan has is a lecturer in the PHAR 505 course. After the position of Dean of the School of Pharmacy became vacant due to the January 2023 resignation of the previous Dean, Dr. Morgan applied for the position of Dean and engaged in multiple forums with students, faculty, staff, and the community regarding her goals as potential Dean. Eventually, however, a different candidate was selected and installed as Dean of the School of Pharmacy on October 6, 2023.

22. Plaintiff is informed and believes, because Plaintiff received a dated copy of the letter, that on October 12, 2023, Dr. Dev sent to Dr. Coop a letter (Grievance) complaining about several instances of Plaintiff's alleged conduct that Dr. Dev interpreted to be unprofessional, disruptive, or violations of the Defendant's technical standards. This letter is Exhibit 0.

23. In this Grievance, Dr. Dev did not claim to have first hand knowledge of any of the allegations. Instead, Dr. Dev wrote, "I am submitting a grievance regarding the Class of 2027 Doctor of Pharmacy student, Joshua Harrell. I am submitting on behalf of several individuals who reported concerns about Joshua's unprofessional conduct." This letter is based on the nine numbered attachments therein.

**Question to Guest Pharmacist at Forum**

24. The Grievance says, "To promote Deaf Awareness, the ACCP and APhA student chapters hosted an APhA-ASP IPSF Forum on deaf awareness and invited a pharmacist with a PhD in Pharmaceutical Science who is also deaf from Gallaudet University. Dr. Cherokee Layson-Wolf (Attachment 1) and third-year pharmacy student, Samantha Staszewski (Attachment 2), reported the unprofessional conduct. This event was intended to promote deaf awareness where the speaker discussed their experiences being deaf and educated how healthcare providers can provide respect. During the question portion of the event, Joshua asked a question completely unrelated to the topic to the guest speaker. They asked whether it was possible to use prions to put bacteria in pairs. The speaker was confused about the relevance and asked them to clarify with the help of the interpreters. Samantha stepped in and asked that only questions related to the topic be asked. Both Dr. Layson-Wolf and Samantha observed that students were upset with Joshua's behavior."

25. Staszewski acknowledges in Attachment 2 that the alleged question was "a microbiology question".

26. Microbiology is a field for which all pharmacists, and all pharmaceutical scientists, receive extensive formal training in order to succeed and excel in their field.

27. Dr. Layson-Wolf acknowledges, in Attachment 1, that after the third year student intervened, Plaintiff "did stop at that point, and the speaker offered to talk with [Plaintiff] during the social afterwards".

28. Staszewski acknowledges in Attachment 2 that Plaintiff's alleged question was asked "During the question portion of our event".

29. Neither the Grievance nor Attachments 1 or 2 alleged that Plaintiff was ever informed at any time before Plaintiff allegedly asked the question, that the event would focus only on the guest pharmacist's Deaf identity to the exclusion of the guest pharmacist's identity as a pharmaceutical scientist.

30. Neither the Grievance nor Attachments 1 or 2 alleged that Plaintiff was ever asked, at any

1
2

time before Plaintiff allegedly asked the question, not to ask any questions about

pharmaceutical science.

3
4
5

31. Neither the Grievance nor Attachments 1 or 2 alleged that any guidance or instructions at all were communicated to Plaintiff, before Plaintiff allegedly asked the question, about what topics would or would not be acceptable to discuss at the event.

6
7
8
9
10

32. Neither the Grievance nor Attachments 1 or 2 alleged any facts that could support an assertion that Plaintiff substantially and materially disrupted the event by asking this question. In fact, Attachments 1 and 2 do not even contain the word "disrupt" or "disruptive" or any of its forms, while the Grievance does not use such words specifically regarding this alleged question.

11

**Incorrect Signs at Forum**

12
13
14
15
16

33. The Grievance next says, "Furthermore, while the speaker was preparing for the event with the organizers, Joshua was disruptive by trying to sign to Dr. Debo but confused him and the interpreters because what they were doing was incorrect hand gestures. This was unprofessional behavior because they did not demonstrate ability to recognize and show respect for the differences in culture, values, and ethics for the guest speaker."

17
18

34. Attachment 1 does not seem to mention this allegation at all. It only appears to be mentioned in the Grievance and Attachment 2.

19
20

35. Neither the Grievance nor Attachment 2 describe any specific signs that were believed to be incorrect.

21
22

36. Neither the Grievance nor Attachment 2 allege that anyone ever asked or instructed Plaintiff not to communicate directly with the guest pharmacist through sign language.

23
24
25

37. Neither the Grievance nor Attachment 2 allege any facts sufficient for a reasonable person, with or without proficiency in signed languages, to attribute any of Plaintiff's incorrect signs to any reason other than Plaintiff's inexperience with signed languages.

26
27

38. Neither the Grievance nor Attachment 2 alleged any facts that could support an assertion that Plaintiff substantially and materially disrupted the event through incorrect signs or

28

8 – COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

hand gestures. Attachment 2 does not even contain the word "disrupt" or "disruptive" or any of its forms. The Grievance, though it describes this alleged behavior as "disruptive", does not mention any facts to support this description.

### Email to PHAR 505 Course Managers

39. The Grievance says, "The email communications support this unprofessional communication that displayed a lack of respect (attachment 4)." Attachment 4 purports to show an email from Plaintiff to Dr. Trovato and Dr. Ross dated September 14, 2023, 2:20 PM.

40. The email purports to be a response to the Course Managers, Dr. Trovato and Dr. Ross, who in the same attachment had just informed Plaintiff by email that they were assessing a noncompliance against Plaintiff for Plaintiff's purported failure to complete a class assignment. Plaintiff purportedly disagreed in the email, contending through several different reasons that there was no noncompliance based on the syllabus and other facts and policies about the course. Plaintiff purportedly concluded the message with a request for action: "It is crucial that we must discuss this promptly to come to an understanding going forward, instead of waiting for a second allegation to prompt a grade penalty."

41. Contrary to the characterizations in the Grievance, there is no unprofessional or disrespectful communication in the email attributed to Plaintiff.

42. There is no content in attachment 4 that, when sent in a single email to two members of faculty, could possibly cause substantial and material disruption to University activities.

### Meeting with PHAR 505 Course Managers

43. The Grievance says, "The course managers, Dr. James Trovato and Dr. Tricia Ross, submitted a grievance letter (attachment 3) due to Joshua's unprofessional behavior during Abilities Lab 1 activities. Specifically, the course managers had notified Joshua regarding a noncompliance warning via email for not completing a Qualtrics pre-laboratory assignment. Joshua brought forth concerns with the course, including the syllabus, specifically the noncompliance section. One example was that they stated that

the course policies was more severe than Maryland Board of Pharmacy state laws. The course managers listened to Joshua's concerns; however, Joshua's communication was unprofessional. Joshua spoke to both course managers in a condescending manner, as if they were being reprimanded for their syllabus, how they upheld course policies, and the way in which they delivered information to students. The email communications support this unprofessional communication that displayed a lack of respect (attachment 4). The course managers felt that Joshua did not know how to communicate their thoughts in an appropriate manner when interacting with school faculty and that there was a complete lack of respect. One of the course managers stated that she was uncomfortable speaking with Joshua alone (attachment 5)."

44. Attachments 3 and 5 appear to stem from an alleged September 26, 2023 meeting between Plaintiff and Dr. Dev, Dr. Ross, and Dr. Trovato.

45. The meeting appears to have come about after the Course Managers, in response to Plaintiff's request, offered, "Thank you for your email. We would like to set up a time to meet with you in person to discuss the noncompliance and address your concerns. Further information regarding the date and time will be sent to you shortly." (Attachment 4)

46. Neither the Grievance nor the Attachments allege that Plaintiff was ever required to attend this meeting.

47. Instead, Attachment 3 reiterates, "The meeting was scheduled at the request of Joshua, in response to an Abilities Lab 1 noncompliance warning email they received for not completing a Qualtrics pre-laboratory assignment."

48. Neither the Grievance nor any of the attachments allege that there were any attendees at the meeting other than Dr. Dev, Dr. Ross, Dr. Trovato, and Plaintiff.

49. Neither the Grievance nor any of the attachments allege that there were any other students at the meeting other than Plaintiff.

50. Attachment 3 purports to further state in a letter from Dr. Trovato and Dr. Ross to Dr. Coop, "Joshua brought forth concerns with our course, including the syllabus,

specifically the noncompliance section. They stated our noncompliance policies are more severe than Maryland Board of Pharmacy state laws. Joshua also expressed concern with the syllabus lacking detailed information regarding the Qualtrics pre-laboratory assignment. Joshua explained they disagree with the process by which students must seek information posted on Blackboard rather than information being pushed to students. We did give Joshua the opportunity to express all their concerns and in turn, we have concerns with the way they communicated such concerns to us. Joshua spoke to both of us in a condescending manner, as if we were being reprimanded for our syllabus, how we uphold course policies and the way in which we deliver information to students. In contrast, Joshua displayed a different level of listening and communicating when interacting with Dr. Dev, who was present with us for the full duration of the meeting. It is our opinion that Joshua does not know how to communicate their thoughts in an appropriate manner when interacting with school faculty. Joshua seems both self-unaware and socially unaware. Rather than being concerned about their achievement of course objectives or academic performance in the course, Joshua is more concerned about questioning and judging course policy and administration. It is our impression that Joshua likes to question and challenge authority. As course managers, we do not appreciate and take offense to Joshua continually telling us how we can run better run the course. Although, at times, Joshua may have a valid point or good suggestion related to course administration, the tone they use to communicate to us is unprofessional and not appropriate as a student communicating to their faculty. Again, they demonstrate a lack of social awareness. In summary, during our meeting with Joshua, we believe they displayed a complete lack of respect. In addition, while we did allow them to express all their concerns, they did not provide us with the courtesy to fully listen to our responses. Please let us know if additional information is needed."

51. Neither the Grievance nor Attachment 3 mention any specific communications from Plaintiff that would be objectively considered by a reasonable person to be

condescending, reprimanding, inappropriate, self-unaware, socially unaware, unprofessional, or disrespectful.

52. Neither the Grievance nor Attachment 3 allege any substantial and material disruption related to this alleged meeting. In fact, Attachment 3 does not even contain the word "disrupt" or "disruptive" or any of its forms. The Grievance does not use any such words in this section of the Grievance.

53. Attachment 5 purports to show an email from Dr. Ross to Dr. Dev and Dr. Trovato in which Dr. Ross writes, "Thank you for the update. I am comfortable with sharing the letter and my level of uncomfortableness during the meeting. Keep us posted."

54. However, neither the Grievance nor Attachment 5, nor any other attachment, attribute the cause of Dr. Ross' discomfort to Plaintiff.

**Class participation**

55. The Grievance further says, "Several P1 students expressed their concern about Joshua's disruptive behavior (attachment 6). There is a consistent issue with Joshua bringing up information that is beyond the realms of the course topic being discussed. Some examples include asking about conformations and stereochemistry when not relevant or bringing in other course information to non-related courses (e.g., discussing General Patient Management information in the Professional Foundations of Pharmacy course). They were also observed using ChatGPT to look things up or reviewing Wikipedia to ask questions from that website. Another example is asking if Dr. Morgan will continue to teach calculations in ABL 1 after she is promoted to Dean, which was an inappropriate question during ABL orientation (attachment 7)."

56. Conformations and stereochemistry are objectively relevant to many different aspects of chemistry, which means that pharmacy students must be properly trained to understand conformations and stereochemistry. A poignant example is the thalidomide tragedies in the 1950s and 1960s. Pharmacists and pharmaceutical scientists in that era did not properly understand how some drug conformations of the thalidomide, with benign and

12 – COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

even therapeutic stereochemistry, interconverted and inverted unexpectedly to form conformations with deadly stereochemistry during pregnancy. As a result, thousands of infants died, and thousands more grew up with severe birth defects.

57. In pharmacy school, it is considered common knowledge that separate classes do not exist in topically separate watertight boxes. Rather, there is some degree of interrelation between every class and every other class.

58. Neither the Grievance nor the Attachments allege that Plaintiff was ever asked not to discuss conformations or stereochemistry in certain situations, not to discuss the topics of one class in another class, not to use ChatGPT or Wikipedia in class, or not to ask certain questions about Dr. Morgan.

59. Neither the Grievance nor the attachments describe a specific situation when Plaintiff allegedly asked about conformations or stereochemistry.

60. Neither the Grievance nor the attachments suggest why asking about conformations or stereochemistry might have been irrelevant in a given situation.

61. Neither the Grievance nor the attachments describe a specific situation when Plaintiff allegedly asked about one course information in a different course.

62. Neither the Grievance nor the attachments suggest why asking about one course information in a different course might have been irrelevant in a given situation.

63. Neither the Grievance nor the attachments suggest why it might have been inappropriate for Plaintiff to ask, during orientation, about whether there might be anything that would keep one of Plaintiff's lecturers from remaining Plaintiff's lecturer throughout the semester.

64. Attachment 7 is dated August 25, 2023, and purportedly describes events of August 22. Neither the Grievance nor the attachments allege that Plaintiff was informed at any time before October 16 that Defendant ever intended to use these allegations in a disciplinary proceeding against Plaintiff.

65. Neither the Grievance nor the attachments allege any substantial and material disruption

due to Plaintiff's alleged decisions to ask about conformations and stereochemistry, ask about the topics of one class in a different class, use ChatGPT or Wikipedia in class, or ask about a lecturer's future availability. In fact, Attachments 6 and 7 do not even mention the words "disrupt", "disruptive", or any of their forms. The Grievance, though it describes this alleged behavior as "disruptive", does not mention any facts to support this description.

**Pharmacy Professor Q&A**

66. The Grievance further says, "They also attended a Question and Answer session for a potential pharmacology professor for the PharmD program. Joshua stated that they were asking a question to ensure that the candidate was being interviewed out of merit and not based upon their personal background and upbringing, which seemed to imply that the candidate was only being interviewed as an affirmative action hire (attachment 8)."

67. However, Attachment 8 quite strongly contradicts two of these factual claims, when it says, "At one point (forgive me, as I don't necessarily remember the direct quote), [Plaintiff] made a remark as a means to ensure Dr. Kibret that the university's invitation for an interview was done out of merit and not based on his personal background and upbringing, seemingly trying to defuse any insinuation that Dr. Kibret was being interviewed as an affirmative action hire".

68. Neither the Grievance nor the attachments allege any substantial and material disruption due to Plaintiff's alleged conduct during the Q&A session. In fact, Attachment 8 does not even mention the words "disrupt", "disruptive", or any of their forms. The Grievance does not use any such words in that section of the Grievance.

**Blowing Nose**

69. The Grievance further says, "The final example occurred on September 11th where Joshua showed a lack of situational/social awareness when they were blowing their nose. Despite being asked to step outside, Joshua continued their disruptive behavior, which disturbed several students with the noise and possible spreading of germs (attachment

14 – COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

9)."

70. However, Attachment 9 itself quite conflictingly alleges, "I wanted to make you aware of a class disruption during PHAR504 lecture (Monday, 9/11). A student, [Plaintiff], showed a lack of situational/social awareness where they were blowing their nose. This caused a class disturbance. I intervened and asked [Plaintiff] if they were ok and needed some time outside the class. [Plaintiff] said no and discontinued [their] disruptive behavior. Several students were disturbed by the noise and possible spreading of germs; [Plaintiff] was wearing a mask but removed it to blow [their] nose.

71. Attachment 9 is dated September 14, 2023 and purportedly refers to events of September 11. Neither the Grievance nor the Attachments claim that Plaintiff was informed at any time before October 16 that Defendant intended to use such allegations in a disciplinary proceeding against Plaintiff.

### Preliminary Evaluation Panel

72. Defendant's three member Preliminary Evaluation Panel is tasked under Defendant's Student Honor Code, Section 5.5 with the following: "The Panel will review the facts presented and determine by majority vote if the matter should be forwarded to the full Committee for a formal hearing or be subject to the informal resolution process described in Section 5.3."

73. Plaintiff is informed and believes that at some time after the Grievance was filed and before the Grievance notification, Dr. Coop, acting as a member of the Preliminary Evaluation Panel, voted to forward the entire Grievance to the full Committee for a full hearing.

74. Plaintiff is informed and believes that at some time after the Grievance was filed and before the Grievance notification, Dr. Fletcher, acting as a member of the Preliminary Evaluation Panel, voted to forward the entire Grievance to the full Committee for a full hearing.

75. These two votes would have been sufficient under Defendant's policy to constitute a

majority to achieve the outcome, so that the third vote would make no difference.

### Grievance notification

76. On October 16, 2023, Dr. Coop sent a Grievance notification by email to Plaintiff. The Grievance notification linked to the Grievance, and linked by reference to the Attachments to the Grievance, which were sent to Plaintiff later the same day.

77. The Grievance notification only mentioned one policy basis for the charge: "Section 3.1. Lewd, obscene, or disruptive behavior on university premises or at university-supervised activities." Dr. Coop later acknowledged in an October 19 email that this only refers to allegations of disruptive activities.

78. The Grievance notification requested a response by October 31. However, in an October 25 email, Dr. Coop clarified that the deadline would be extended one week, to November 7.

### Plaintiff's administrative request for dismissal denied

79. On October 25, 2023 at 1:53 PM, Plaintiff sent a lengthy email to Dr. Coop, Dr. Fletcher, Dr. Dev, Dr. Ross, and Dr. Trovato, requesting withdrawal and dismissal of all the portions of the action that were preempted by the state and federal constitutions. Specifically, Plaintiff raised in this message the concern that both the initiation and the continued pendency of the disciplinary action constituted retaliation against constitutionally protected conduct. Plaintiff presented in that message much of the First Amendment case law presented in this Complaint.

80. Dr. Coop responded at 3:16 PM the same day, "Joshua: I acknowledge receipt of your email of October 25, 2023 regarding "Request for Immediate Dismissal of Disciplinary Action against Protected Speech". I am afraid the Honor Code does not have a provision for ceasing the process once initiated. The process will continue as per the Honor Code. AC"

81. Plaintiff responded at 9:01 PM the same day, again pleading the state and federal Constitution and advising all recipients of Plaintiff's previous message that such inaction

16 – COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

would leave Plaintiff with no choice but to pursue legal remedies. Plaintiff further pleaded Defendant to consider the multiple reasonable proposals Plaintiff had previously provided to legally effect a dismissal consistently with both the Student Honor Code and the state and federal constitutions, but Defendant never responded to these concerns.

82. Dr. Coop repeated the rejection the next day on October 26, 2023, writing: "As I stated, the hearing process will continue as per the School Honor Code. I am here to answer questions concerning our approach and policy, not to answer questions about changing or modifying our approach and policy. If you still have the same concerns after the Discipline and Grievance Committee makes recommendations, you may wish to bring up these issues in an appeal. AC"

**UMSOP Technical Standards**

83. The Grievance says, "[Plaintiff has] also failed to meet the technical standards of the program, which require collaborative skills, effective communication, appropriate responses to communications, respect for the differences in culture, values and ethics, and interpersonal skills sufficient to communicate effectively."

84. Although the Grievance mentions the UMSOP Technical Standards, the Grievance Notification does not, which makes it unclear whether Defendant intends to enforce the Technical Standards in this case.

85. The UMSOP Technical Standards Introduction states, "The mission of the University of Maryland, School of Pharmacy (UMSOP) is to enhance health through innovative pharmaceutical education, research, practice and public service. The School's professional curriculum is innovative and flexible, based on strong basic sciences, has extensive clinical content, and emphasizes the development of problem solving and collaborative skills. Instructional activities will be driven by terminal performance outcomes or specific abilities all pharmacists are expected to competently perform in order to fulfill their professional responsibilities. The terminal performance outcomes may be found on the School of Pharmacy website at

17 – COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

http://catalog.pharmacy.umaryland.edu/."

86. The UMSOP Technical Standards further require under the Communication section, "The student must be able to: • Retain and recall information in an efficient and timely manner. • Communicate effectively, including demonstrating professionalism and sensitivity, with faculty, staff, other students, patients, patients' families, members of the health care team, and the public. • Read, write, speak and comprehend English with sufficient mastery to accomplish didactic, clinical and laboratory curricular requirements in a timely, high quality, professional and accurate manner. • Perceive and respond appropriately to verbal, non-verbal, written and oral communications from faculty, staff, other students, patients, health care team members, colleagues, and families essential to complete didactic and clinical curricular requirements."

87. The UMSOP Technical Standards do not define or further explain the terms "collaborative", "effective", "appropriate", or "effectively".

88. The UMSOP Technical Standards do not describe how failure to meet the Technical Standards will be enforced.

89. While many other institutions attempt to repair their constitutionally questionable communications policies through a carveout clause that declares that such policies cannot be enforced against conduct protected by the First Amendment, the UMSOP Technical Standards contain no such carveout clause. In fact, the document does not even mention the First Amendment.

## COUNTS

### FIRST COUNT: QUESTION TO GUEST PHARMACIST AT FORUM

90. Plaintiff incorporates all previous paragraphs as if fully stated herein.

91. Defendant currently maintains disciplinary action against Plaintiff for Plaintiff's alleged actions of asking a question to a guest pharmacist at a forum.

92. However, the facts as alleged by Defendant only describe conduct protected by the First Amendment.

18 – COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

93. Thus, injunction is warranted to stay and to instruct Defendant to dismiss this disciplinary action.

## SECOND COUNT: INCORRECT SIGNS AT FORUM

94. Plaintiff incorporates all previous paragraphs as if fully stated herein.

95. Defendant currently maintains disciplinary action against Plaintiff for Plaintiff's alleged actions of making incorrect signs when communicating with a Deaf guest.

96. American Sign Language is protected by the First Amendment, just as spoken languages are (Heyer v. United States Bureau of Prisons, 849 F.3d 202 (4th Cir. 2017)).

97. The facts as alleged by Defendant only describe conduct protected by the First Amendment.

98. Thus, injunction is warranted to stay and to instruct Defendant to dismiss this disciplinary action.

## THIRD COUNT: EMAIL TO PHAR505 COURSE MANAGERS

99. Plaintiff incorporates all previous paragraphs as if fully stated herein.

100.    Defendant maintains disciplinary action against Plaintiff for Plaintiff's alleged actions of sending course related grievances in an email to Plaintiff's PHAR505 Course Managers.

101.    However, the facts as alleged by Defendant only describe conduct protected by the First Amendment.

102.    Thus, injunction is warranted to stay and to instruct Defendant to dismiss this disciplinary action.

## FOURTH COUNT: MEETING WITH PHAR505 COURSE MANAGERS

103.    Plaintiff incorporates all previous paragraphs as if fully stated herein.

104.    Defendant maintains disciplinary action against Plaintiff for Plaintiff's alleged actions of raising Plaintiff's course related grievances in a meeting with Plaintiff's PHAR505 Course Managers.

105.    However, the facts as alleged by Defendant only describe conduct protected by

the First Amendment.

106.     Thus, injunction is warranted to stay and to instruct Defendant to dismiss this disciplinary action.

### FIFTH COUNT: ASKING QUESTIONS ABOUT CONFORMATIONS AND STEREOCHEMISTRY IN CLASS

107.     Plaintiff incorporates all previous paragraphs as if fully stated herein.

108.     Defendant maintains disciplinary action against Plaintiff for Plaintiff's alleged actions of asking questions about conformations and stereochemistry in class.

109.     However, the facts as alleged by Defendant only describe conduct protected by the First Amendment.

110.     Thus, injunction is warranted to stay and to instruct Defendant to dismiss this disciplinary action.

### SIXTH COUNT: DISCUSSING GENERAL PATIENT MANAGEMENT INFORMATION IN PROFESSIONAL FOUNDATIONS OF PHARMACY CLASS

111.     Plaintiff incorporates all previous paragraphs as if fully stated herein.

112.     Defendant maintains disciplinary action against Plaintiff for Plaintiff's alleged actions of discussing General Patient Management information in Professional Foundations of Pharmacy class.

113.     However, the facts as alleged by Defendant only describe conduct protected by the First Amendment.

114.     Thus, injunction is warranted to stay and to instruct Defendant to dismiss this disciplinary action.

### SEVENTH COUNT: USING CHATGPT AND WIKIPEDIA IN CLASS

115.     Plaintiff incorporates all previous paragraphs as if fully stated herein.

116.     Defendant maintains disciplinary action against Plaintiff for Plaintiff's alleged actions of using ChatGPT and Wikipedia in class.

117.     However, the facts as alleged by Defendant only describe conduct protected by

20 – COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

the First Amendment.

118.    Thus, injunction is warranted to stay and to instruct Defendant to dismiss this disciplinary action.

### EIGHTH COUNT: ASKING ABOUT LECTURER'S FUTURE AVAILABILITY

119.    Plaintiff incorporates all previous paragraphs as if fully stated herein.

120.    Defendant maintains disciplinary action against Plaintiff for Plaintiff's alleged actions of asking a question at orientation about Dr. Morgan's future availability.

121.    However, the facts as alleged by Defendant only describe conduct protected by the First Amendment.

122.    Thus, injunction is warranted to stay and to instruct Defendant to dismiss this disciplinary action.

### NINTH COUNT: PHARMACY PROFESSOR Q&A

123.    Plaintiff incorporates all previous paragraphs as if fully stated herein.

124.    Defendant maintains disciplinary action against Plaintiff for Plaintiff's alleged actions of asking a question, or making a remark, to a pharmacy professor candidate at a Q&A.

125.    However, the facts as alleged by Defendant only describe conduct protected by the First Amendment.

126.    Thus, injunction is warranted to stay and to instruct Defendant to dismiss this disciplinary action.

### TENTH COUNT: BLOWING NOSE

127.    Plaintiff incorporates all previous paragraphs as if fully stated herein.

128.    Defendant maintains disciplinary action against Plaintiff, purportedly for Plaintiff's alleged actions of blowing their nose.

129.    However, at the time around and shortly after the alleged incident of Plaintiff blowing their nose on September 11, 2023, Defendant considered those allegations too trifling to bring disciplinary action against Plaintiff, and instead took no action within the

next month. Dr. Coop failed to convene the Preliminary Evaluation Panel within 15 days in response to the Grievance Dr. Jones purportedly sent to Dr. Coop on September 14, 2023, as required by Student Honor Code Section 5.5, thus permanently waiving Defendant's ability to bring disciplinary action for these allegations consistently with Defendant's Student Honor Code.

130.    Instead, Defendant waited until after receiving more allegations that Plaintiff had engaged in protected speech. Then, on October 16, more than a month after the blowing nose allegations, Defendant notified Plaintiff that Plaintiff would be subject to disciplinary action for allegedly blowing their nose, along with the allegations of protected speech.

131.    Thus, but for Plaintiff's alleged decisions to exercise their right to free speech and petition, Defendant never would have brought disciplinary action against Plaintiff for blowing their nose.

132.    Alternatively, Plaintiff's alleged decisions to exercise their right to free speech and petition were substantial or motivating factors in Defendant's decision to bring disciplinary action against Plaintiff for blowing their nose.

133.    Either way, Defendant disciplines Plaintiff, purportedly for blowing Plaintiff's nose, but in violation of Plaintiff's right under the First Amendment to be free from retaliation against the exercise of free speech and petition.

134.    Defendant's legitimate and nonretaliatory motives, if any, were de minimis and trivial, insufficient to support the actual adverse action, as seen in the following circumstances:

    a.  Attachment 9 reports that Plaintiff's disruptive behavior (if there was any) discontinued after the professor's first intervention. This practically rules out the need for formal intervention, by instead showing that informal intervention was sufficient to obtain the desired conduct from Plaintiff.

    b.  But for the single intervention which was alleged to have been successful,

Defendant does not allege any other formal or informal contact in which any other agent of Defendant contacted Plaintiff with concerns about Plaintiff blowing their nose, until more than a month later.

c. Defendant does not allege that there were any other nose blowing related incidents at any time before this alleged incident, nor in the intervening month after this alleged incident and before the date of the Grievance notification.

d. Attachment 9 documents that Plaintiff was wearing a mask, which would mitigate the severity of any social unawareness, by showing that Plaintiff did place some effort into hygiene in social spaces.

e. Both the Grievance and Attachment 9 are unclear about what exactly Plaintiff was socially unaware about, and how this became disruptive. One might speculate about what this means: whether Plaintiff's shirt was unbuttoned too low while blowing their nose, or if Plaintiff ignorantly used a Pittsburgh Steelers handkerchief to blow their nose in Ravens territory, or if Plaintiff was unknowingly making a high pitched noise while blowing their nose.

f. The Grievance was submitted to, and referred to full Committee by, the Preliminary Evaluation Panel despite the critical discrepancies between the Grievance and Attachment 9 regarding the nose blowing allegation. To put them in the best light, this would indicate that Dr. Dev, Dr. Coop, and Dr. Fletcher spent very little time or effort evaluating the allegations before forwarding them for disciplinary action.

g. Even though Section 5.3 of Defendants' Student Honor Code authorizes the Preliminary Evaluation Panel to refer minor violations to informal resolution, the Preliminary Evaluation Panel instead chose to bypass this step and forward the nose blowing charge to the full committee. This raises concerns about whether Plaintiff will be treated with the due process right of proportionality in student conduct proceedings regarding this allegation.

23 – COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

h. Dr. Dev has not stated what sanctions are sought for this allegation, and has not foreclosed the possibility that Dr. Dev will seek Plaintiff's dismissal from the School of Pharmacy as a sanction in response to this nose blowing allegation. This raises concerns about whether Plaintiff will be treated with the due process right of proportionality in student conduct proceedings regarding this allegation.

i. Defendant's action of designating Dr. Dev as the Grievant, though Dr. Dev claims no firsthand knowledge of the allegations, seems to be a strategy to consolidate a de minimis allegation to augment other unsupported allegations, though it would not be worth raising the nose blowing allegation on its own. Further, Defendant only allows Plaintiff to ask questions to the Grievant at the hearing, making it appear that the improper designation of Dr. Dev as Grievant means that Plaintiff will not have an opportunity to cross examine Dr. Jones, the actual purported author of Attachment 9 and source of the allegations. This denial of the right to cross examination will cast further doubt on whether Plaintiff's rights will actually be respected during the disciplinary process.

135. Thus, injunction is warranted to stay and to instruct Defendant to dismiss this disciplinary action.

## **PRAYER FOR RELIEF**

136. Plaintiff prays that this Court preliminarily and permanently enjoin Defendant from bringing any disciplinary action against Plaintiff based on the following allegations:

a. Plaintiff's alleged actions of asking a question to a guest pharmacist at a forum

b. Plaintiff's alleged actions of making incorrect signs when communicating with a Deaf guest

c. Plaintiff's alleged actions of sending course related grievances in an email to Plaintiff's PHAR505 Course Managers

d. Plaintiff's alleged actions of raising Plaintiff's course related grievances in a meeting with Plaintiff's PHAR505 Course Managers

24 – COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

  e. Plaintiff's alleged actions of asking questions about conformations and stereochemistry in class

  f. Plaintiff's alleged actions of discussing General Patient Management information in Professional Foundations of Pharmacy class

  g. Plaintiff's alleged actions of using ChatGPT and Wikipedia in class

  h. Plaintiff's alleged actions of asking a question at orientation about Dr. Morgan's future availability

  i. Plaintiff's alleged actions of asking a question, or making a remark, to a pharmacy professor candidate at a Q&A

  j. Plaintiff's alleged actions of blowing their nose

137. Plaintiff prays to this Court for declaratory relief recognizing that Plaintiff's First Amendment rights were violated by Defendant's actions, and affirming the extent of the First Amendment rights of similarly situated students at the University of Maryland School of Pharmacy.

138. Plaintiff prays to this Court for any other declaratory and injunctive relief necessary to protect Plaintiff's First Amendment rights.

139. Plaintiff prays that this Court award costs to Plaintiff.

140. Plaintiff prays to this Court for any other just and proper relief.

## CONCLUSION

141. The significance of free speech is summed up in the wise words of Dr. Martin Luther King Jr on March 8, 1965: "A man dies when he refuses to stand up for that which is right. A man dies when he refuses to stand up for justice. A man dies when he refuses to take a stand for that which is true." The guidance to students from the Foundation for Individual Rights in Education in its Guide to Free Speech on Campus is especially on point (p. 176-177): "If your school tells you not to worry because it is only investigating you for your speech, **do not accept this explanation**. If the university were to investigate speech every time someone reports offense, the result would be the same as if it actually

1

2

punished the speaker: people would avoid speaking, especially on controversial topics, in order to avoid being investigated."

### VERIFICATION UNDER PENALTY OF PERJURY

142.    I, Joshua Harrell, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge. Executed on January 9, 2024 (Eastern Standard Time)

*John Harrell*